**In re GRIFFIN TRADING COMPANY, Debtor.**

**Leroy G. Inskeep, as trustee of the estate of Griffin Trading Company, Plaintiff,**

v.

**Checkers, Simon & Rosner, LLP, Defendant.**

**Bankruptcy No. 98 B 41742.**
**Adversary No. 00 A 00291.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

July 20, 2000.

Charles H. Cole, Schuyler, Roche & Zwirner, Chicago, IL, for Movant or Plaintiff.

William J. Connelly, Hinshaw & Culbertson, Chicago, IL, for Respondent or Defendant.

## MEMORANDUM OPINION ON DEFENDANT'S MOTION TO DISMISS

ERWIN I. KATZ, Bankruptcy Judge.

This Adversary case relates to a bankruptcy proceeding filed by Griffin Trading Company ("Griffin") under Chapter 7 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* The Chapter 7 Trustee, (the "Trustee") has filed a complaint against Checkers, Simon & Rosner, LLP, ("Checkers") seeking damages in the amount of $2,000,000 for Checkers' professional negligence and breach of contract. This matter comes before the Court on Checkers' Motion to Dismiss the Complaint. For the reasons set forth, the Motion to Dismiss is denied. The adversary proceeding will be

stayed to allow the parties to proceed with mediation and arbitration.

## FACTUAL BACKGROUND

Griffin was a business specializing in clearing services and the buying and selling of commodities and United States Government securities, with its principal office located in Chicago, Illinois. Griffin had been in business for more than 20 years prior to its petition in bankruptcy. Checkers was a certified public accounting firm with its principal place of business located in Chicago, Illinois.

In November 1994, Griffin established a trading account in Griffin's name with ABN/AMRO Sage Corporation ("Sage"). In July 1997, Griffin's chief financial officer, Scott Szach ("Szach"), had software installed on his computers so that he could trade on the account. In August 1997, Szach added a new general ledger account, Number 1233, to Griffin's books. Szach named the account "Equity with Sage" and began posting company trades through this account. Soon thereafter, Szach transferred $100,000 to Sage from Griffin's bank account at Harris Bank. Between August 1997 and December 1997, Szach traded on Griffin's account and lost $108,000. Szach concealed this loss by inconspicuously placing a considerable portion of the loss ($94,000) in a "miscellaneous-other" receivable category in Griffin's monthly financial reports.

In December 1997, Checkers was retained by Griffin to audit financial statements and related documents pertaining to Griffin's fiscal year ending on December 31, 1997. On December 29, 1997, Checkers drafted an engagement letter that Szach executed on behalf of Griffin. The relevant provisions of the engagement letter earmarked specific services that Checkers agreed to perform pursuant to the Contract:

1) Conduct its audit in accordance with generally accepted standards;

2) Make specific inquiries of management and others about the represen-

tations embodied in the financial statement;

3) Examine the effectiveness of Griffin's internal control structure for the purpose of determining the nature, timing and extent of office procedures that would provide management with reasonable, but not absolute, assurance that

a) assets are safeguarded against unauthorized use or disposition, and

b) transactions are executed in accordance with management's authorizations.

During the audit of Griffin, a member of Checkers's audit team inquired of Griffin's director of accounting, Robert Hooper ("Hooper"), about the "miscellaneous-other" receivable category. Hooper informed the Checkers representative that the money in this receivable category represented a personal loan from Griffin to Szach. Subsequently, a member of the Checkers audit team confirmed this representation with Szach. Following this conversation, Szach reclassified the "loan" on Griffin's monthly financial report to category 13D, receivables from employees. No representative from Checkers ever discussed the fact that the records indicated that Griffin had made a considerable loan to Szach, or that Szach had lost money trading in Griffin's account at Sage with any of Griffin's three directors. At no time did any representative of Checkers ever seek any written confirmation regarding this "miscellaneous-other" receivable.

Following completion of the audit, Checkers authored Griffin's Financial Report and Annual Report. The "loan" was included under "Assets"-"Receivables"-"Other" category in both reports in the amount of $213,298.00. Neither report contains a note, indication or explanation of the Szach "loan." For the period starting January 1998 and continuing through December 1998, Szach continued to trade on Griffin's "Equity with Sage" account. During this period, Szach hid his trading

losses so that Griffin's directors and officers could not have discovered his losses by any reasonable means. On December 23, 1998, Szach admitted his wrongdoing to the directors and officers at Griffin. Szach's losses on the unauthorized account totaled approximately $2,000,000. On December 30, 1998, Griffin filed a Chapter 7 bankruptcy petition in this District and the Trustee was appointed. On March 13, 2000, the Trustee filed the present adversary complaint.

The Contract provides in pertinent part: In the event that differences concerning our services or fees should arise that are not resolved by mutual agreement, we both agree that the controversy or claim shall be submitted first to voluntary mediation, and if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures set forth in Exhibit A . . .

The Contract provides that disputes in connection with the services rendered by Checkers that are not resolved by mutual agreement shall be first submitted to voluntary mediation, and if mediation is not successful, then to binding arbitration. The Contract also limits liability for "failure to discover a fraud or embezzlement" to the aggregate fees incurred during the period of service that Checkers' audits failed to uncover such irregularities. On April 14, 2000, Checkers made a written offer to pay an amount in excess of the aggregate fees received by Checkers during the relevant time period. Checkers states that its offer is an offer of complete relief under the Contract.

### JURISDICTION

Before reaching the merits of either party's case, the Court must determine whether it has jurisdiction over the issues presented. The parties dispute the type of jurisdiction; the Trustee alleges "core" jurisdiction and Checkers alleges "related to" jurisdiction. Bankruptcy courts may enter final orders and judgments, subject to appeal, in core proceedings. 28 U.S.C. § 157(b). However, in non-core proceedings a bankruptcy court must submit proposed findings of fact and conclusions of law to the district court, which has the power to enter the final order. 28 U.S.C. § 157(c).

Core matters are those "arising under" title 11 or "arising in" a case under title 11. 28 U.S.C. § 157(b). A matter "arising under" title 11 involves a cause of action created or determined by a statutory provision of title 11. *Barnett v. Stern,* 909 F.2d 973, 981 (7th Cir.1990); *Wood v. Wood (In re Wood),* 825 F.2d 90, 96 (5th Cir.1987). A proceeding "arising in" a case under title 11 involves those administrative matters that arise only in bankruptcy cases. *Diamond Mtg. Corp. of Illinois v. Sugar,* 913 F.2d 1233, 1239 (7th Cir.1990); *Wood,* 825 F.2d at 97. " '[A]rising in' proceedings are those that are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy." *Wood,* 825 F.2d at 97.

Non-core matters over which bankruptcy courts have jurisdiction are those "related to" a bankruptcy case. Even the titles on the counts of the Complaint, "Professional Negligence" and "Breach of Contract," suggest the typical case under "related to" jurisdiction:

The reference to cases related to bankruptcy cases is primarily intended to encompass tort, contract, and other legal claims by and against the debtor, claims that were it not for bankruptcy, would be ordinary stand-alone lawsuits between the debtor and others, but that section 1334(b) allows to be forced into bankruptcy court so that all claims by and against the debtor can be determined in the same forum.

*Zerand–Bernal Group, Inc. v. Cox,* 23 F.3d 159, 161 (7th Cir.1994). Although neither the Bankruptcy Code nor the jurisdictional statutes define the term "related to," the Seventh Circuit has held that a

case is "related to" a bankruptcy when it affects either the amount of property in the bankruptcy estate or the distribution of that property among the creditors. *In re: FedPak Systems, Inc.,* 80 F.3d 207, 213–14 (7th Cir.1996); *Elscint, Inc. v. First Wisconsin Financial Corp. (In re: Xonics, Inc.),* 813 F.2d 127, 131 (7th Cir. 1987).

 This proceeding is a non-core proceeding "related to" a bankruptcy under 28 U.S.C. § 1334(b).

## DISCUSSION

The question presented is whether the Trustee's claims for breach of contract and professional negligence are encompassed by the contractual provisions that send "differences concerning services or fees" to mediation and arbitration.

Checkers asserts that if Griffin did in fact suffer damages as a result of either Checkers' professional negligence or breach of contract, the claims are covered by this provision of the contractual agreement. Therefore, the adversary proceeding is barred by the provisions of the Contract. The Trustee asserts that the term "services" does not include Checkers' alleged failure to discover a fraud within the company and failure to perform the audit in accordance with generally accepted auditing standards. Therefore, it is not required to mediate and arbitrate its claims pursuant to the "Resolution of Disputes" clause in the Contract. For the reasons set forth below, the Court finds that the term "services" includes Checkers' alleged conduct. The parties must resolve their disputes in mediation and arbitration prior to seeking relief from this Court.

*The Plain Language of the Contract Indicates that the Parties are Bound to Resolve Their Dispute in Mediation and/or Arbitration*

 "It is undesirable to make the law more complicated by proliferating special review standards without good rea-

son." *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 939, 115 S.Ct. 1920, 1921, 131 L.Ed.2d 985 (1995). The resolution of this case comes down to contract construction. Illinois follows the plain meaning rule in interpretation of contracts. *Bourke v. Dun & Bradstreet Corp.,* 159 F.3d 1032, 1036 (7th Cir.1998) "When interpreting a contract, we must determine the meaning of the provisions from the language, and we will not arrive at a construction of the contract which runs contrary to the plain and ordinary meaning of the language used." *Grundstad v. Ritt,* 166 F.3d 867, 871 (7th Cir.1999); *Konewko v. Kidder, Peabody & Company,* 173 Ill. App.3d 939, 123 Ill.Dec. 617, 528 N.E.2d 1, 3 (1988).

 The "Resolution of Disputes" clause provides that differences concerning Checkers' **services** or fees be resolved by mediation or arbitration. (emphasis added). "Services" are defined as " things purchased by consumers that do not have physical characteristics (e.g., services of doctors, lawyers, accountants, dentists, repair personnel)." *Black's Law Dictionary.* According to the terms of the Contract, the services Checkers was to perform included an audit conducted in accordance with generally accepting practices/standards and a determination of procedures to assure management that its assets were safeguarded and transactions were authorized. An "audit" is a "systematic inspection of accounting records involving analyses, tests, and confirmations." *Id.* Therefore, Griffin's allegations that Checkers' audit failed to produce the desired results is necessarily a difference concerning Checkers' services.

In short, Griffin complains about the quality of Checkers' services and the extent to which Checkers performed them. The Court can reach only one reasonable conclusion in reading the plain language of the Contract: "differences concerning [Checkers'] services" encompasses the claims that Checkers performed its auditing services poorly or did not perform

their services at all. Any other reading of the language would run contrary to its plain and ordinary meaning. Furthermore, while Griffin argues that the plain meaning is not the meaning intended, it has not suggested any other meanings for the term "services." The Court is thus left only with its natural reading of the agreement. The plain language of the Contract binds the parties to resolve this dispute in mediation and arbitration.

*The Federal Arbitration Act Favors Arbitrability When Only the Scope of Arbitration is in Doubt*

Neither side disputes that the mediation/arbitration clause is valid. The only question the Trustee raises is whether it applies to the Trustee's claims of breach of contract and negligence.

 The strong federal policy favoring arbitration supports the conclusion that, pursuant to the terms of their Contract, the parties must mediate and arbitrate their differences. The Federal Arbitration Act ("FAA"), 9 U.S.C.A. § 1, et seq., provides that an arbitration clause in a "contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (1999). It is well-settled that arbitration is a favored means of dispute resolution, and the FAA established a clear policy favoring arbitration. *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 909 (7th Cir.1999). To effect this policy, the Court must liberally construe any contractual language pertaining to arbitration and resolve doubts in favor of arbitrability. *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

 A party contesting the submission of the claim to arbitration must clearly show that the presumption of arbitrability does not apply. *International Union of Operating Engineers, Local Union 103 v. Indiana Const. Corp.*, 13 F.3d 253, 255–56 (7th Cir.1994). "Whether a particular issue is arbitrable is a matter of contract interpretation, because 'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Kiefer*, 174 F.3d at 909 (quoting *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)). A claim will be deemed arbitrable if an arbitration clause is capable of any interpretation that a claim is covered. *International Union of Operating Engineers, Local Union 103 v. Indiana Const. Corp.*, 13 F.3d 253, 255–56 (7th Cir.1994). If parties have a contract providing for arbitration of some issues, questions concerning the scope of issues subject to arbitration should be resolved in favor of arbitration. *Miller v. Flume*, 139 F.3d 1130, 1136 (7th Cir.1998); *See also Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 476, 109 S.Ct. 1248, 1254, 103 L.Ed.2d 488 (1989) (stating that "due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself be resolved in favor of arbitration."); *See also Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S., at 24–25, 103 S.Ct., at 941 (stating that "[T]he Arbitration Act established that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself . . .").

 The heavy presumption in favor of arbitration shall be extended when there is a possibility that a dispute is covered by an existing, valid arbitration clause. *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 648, 650, 106 S.Ct. 1415, 1418–19, 89 L.Ed.2d 648 (1986), quoting *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. at 582–83, 80 S.Ct. at 1352–53, 4 L.Ed.2d 1409 (1960) (stating when an agreement contains an arbitration clause, there is a

presumption of arbitration in the sense that "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute").

The Trustee claims the strong presumption in favor of arbitration is overcome because the Contract did not specify the scope of the term "services" in the "Resolution of Disputes" section. Therefore, it argues that the Court should deem the clause ambiguous and ultimately not applicable to its claims. As discussed in the previous section, however, the term "services" is not ambiguous and includes the differences here at issue.

*The Contract Contains a Separate Arbitrability Clause that Necessitates the Question Over the Scope of the Valid Arbitration Clause to be Resolved by an Arbitrator*

Finally, the Contract and its exhibits require that the arbitrator resolve the question of which issues are subject to the dispute resolution clause. *Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560, 565 (7th Cir.1995) (holding that a contract "should be read as a whole so that all of its parts will be given effect"); *Preze v. Board of Trustees*, 5 F.3d 272, 274 (7th Cir.1993); *Ryan v. Chromalloy Am. Corp.*, 877 F.2d 598, 604 (7th Cir.1989):

> Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the **arbitrators.**

(emphasis added).

■ In *AT & T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 649, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986), the Court held that if the parties clearly and unmistakably agree to arbitrate, then question of arbitrability is for an arbitrator. See also *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) (holding that the question of whether arbitrators or courts have primary power to decide if parties agreed to arbitrate merits of dispute depends on whether parties agreed to submit question of arbitrability to arbitration). In this case, the two parties explicitly agreed to have the arbitrator decide the issue of arbitrability. In a separate and conspicuous section, the Contract contains clear, explicit language stating that disputes concerning the scope of arbitrability should be resolved by arbitrators. The Contract is clear that the scope of arbitrability should be left for the arbitrator.

*Implications of Enforcing the Contract*

■ Checkers argues that since the clause indicates that disputes should go to mediation and arbitration, then this adversary complaint should be dismissed. However, the Trustee contends that federal law mandates that the adversary complaint should be stayed until after the mediation and/or arbitration. Section 3 of the Federal Arbitration Act provides as follows:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

The law is clear; this matter will be stayed pending the outcome of the mediation or arbitration. *Penn v. Ryan's Family Steakhouses, Inc.*, 95 F.Supp.2d 940, 942 (N.D.Ind.2000) (stating that when a valid

agreement to arbitrate exists between the parties and covers the matter in dispute, the Federal Arbitration Act requires the federal courts to stay any ongoing judicial proceedings and to compel arbitration).

In light of the decision to stay proceedings pending mediation and arbitration, it is unnecessary to address the portion of the Motion with respect to the "Limitations on Liability" clause. The parties will either resolve the issues in mediation or an arbitrator will resolve it for them.

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss Plaintiff's Complaint is denied. The Adversary Proceeding is stayed pending the outcome of the mediation or arbitration.