**In re Nicholas William BETZOLD, Jr., Debtor.**

**No. 04 B 28474.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Oct. 14, 2004.

R. Scott Alsterda, Gregg E. Szilagyi, Christopher L. Rexroat, John Buckley, Ungaretti & Harris, Chicago, IL, for Movants, Richard S. Berg, Philip M. Nussbaum and Bradford J. Heitman.

David N. Missner, William Choslovsky, Piper Rudnick, Chicago, IL, for Respondent, Nicholas William Betzold, Jr.

Richard C. Friedman, Office of the United States Trustee, Chicago, IL, U.S. Trustee.

### MEMORANDUM OPINION

JOHN D. SCHWARTZ, Bankruptcy Judge.

This matter comes before the court on the motion of Richard S. Berg, Philip M. Nussbaum and Bradford J. Heitman (collectively "Partners") for Relief from the Automatic Stay so that the arbitration proceedings involving the Partners and the Debtor hereinafter described may be completed ("Motion"). For the reasons stated herein, the Motion will be granted.

This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(b) and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. The proceeding concerns the modification of the automatic stay and is therefore a

core proceeding under 28 U.S.C. § 157(b)(2)(G). Venue is properly placed in this Court pursuant to 28 U.S.C. § 1409(a).

## BACKGROUND

On August 2, 2004 ("Petition Date"), Nicholas William Betzold, Jr. ("Debtor"), filed a voluntary petition for reorganization under chapter 11 of title 11 of the United States Code ("Bankruptcy Code"). On the same day, he filed a three-count adversary complaint ("Adversary Complaint") against the Partners, Betzold Investment Group, Inc., and Betzold Research & Trading, Inc. (collectively "Companies") and a "Motion to Enforce Automatic Stay."

### Events Prior to the Petition Date Leading up to the Arbitration

In 1994, the Debtor and one of the Partners, Richard Berg, founded the Companies which provide investment services for institutional customers. (Joint Submission of Facts Regarding Partners' Motion for Relief from Automatic Stay (hereinafter "JS"), ¶ 2). Betzold Research is an NASD regulated broker-dealer that buys and sells fixed income securities. (JS, ¶ 2). Betzold Investment is an SEC-registered investment firm that provides portfolio management services and educational services. (JS, ¶ 2).

Starting in 1999, the Partners and the Debtor became embroiled in internecine disputes over the operation and direction of the Companies. The problems were exacerbated by the fact that at the time no one of them held a controlling interest. (*See* JS, ¶ 3). To break the deadlock, the Debtor and the Partners negotiated an arrangement whereby the Debtor would purchase enough shares from each of the Partners to give the Debtor controlling interest in the Companies.

The arrangement was documented by a number of written agreements, entered into on July 21, 1999, including a Stock Purchase and Option Agreement ("SPA"), a Shareholders' Agreement ("SA"), and Employment Agreements for each Partner. (JS, ¶ 4, *see also*, Exhibits 1, 2 and 3 of Partners' Evidentiary Exhibits in Support of Their Motion for Relief from Automatic Stay (hereinafter "Exhibits")) [1]. Under the SPA, in exchange for receiving a payment of $10.6 million from the Debtor, the Partners agreed, *inter alia*, to sell 17.7% of the Companies' stock to the Debtor. (JS, ¶ 4 and Exhibit 1). The SPA references a loan the Debtor obtained from the American National Bank to fund his purchase of the stock ("Bank Loan"). (Exhibit 1, § 4). On closing, the Debtor became and is currently the owner of 51.03% of the Companies' outstanding stock and the Partners collectively own 48.97% thereof. (JS, ¶ 3).

The Partners contend that from 1999 to 2002, the Debtor paid himself in excess of $23 million from the Companies. (Partners' Submission of Facts Regarding the Motion for Relief from Automatic Stay (hereinafter, "PS"), ¶ 10). Of that amount, the Partners assert that approximately $15 million "was applied to repay the bank [the Bank Loan] under the terms of the loan agreement and the interest and taxes related to those payments," and approximately $4.5 million was to fund a reserve fund. (Exhibit 10, ¶ 6). The balance of the total compensation, approximately $3.5 million, was in payment for the Debtor's services as Chairperson, President, CEO and Sales Manager. (Exhibit 10, ¶ 6). The Partners argue that only the $3.5

---

1. All eighteen of the Exhibits were admitted into evidence without objection. The Debtor offered no exhibits.

million payment for the Debtor's services was authorized under the SA. (Exhibit 10, ¶ 6). Section 2.3 of the SA provides, *inter alia:*

> Subject to the provisions for base salaries in the employment agreements of even date herewith between BBNH[2] and certain of the Shareholders, until all debt incurred by Nick [Debtor] or BBNH to purchase BBNH Securities of any of the RPB Shareholders [Partners] pursuant to this Agreement or the Purchase Agreement has been repaid (the "Repayment Event") and a "Parity Event" has occurred, the compensation of Shareholders for work as employees of BBNH or any BBNH Company shall be in accordance with Nick's determination, in his sole and absolute discretion.

(Exhibit 2, § 2.3).

### The Arbitration Proceeding and State Court Lawsuit

Section 6(a) of the SPA (hereinafter, "SPA Arbitration Provision") provides as follows:

> *Any controversy or claim arising out of or relating to this Agreement, or the breach hereof shall be settled by a single arbitrator in arbitration conducted in Chicago, Illinois, in accordance with the Commercial Arbitration Rules of JAMS/Endispute, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The arbitrator's decision shall be final and nonappealable.* Each party shall be entitled to discovery exclusively by the following means: (i) request for admission, (ii) request for production of documents, and (iii) depositions of no more than 10 individuals lasting no more than 6 hours each, excluding objections. All discovery shall be completed, and the arbitra-

tion hearing shall commence within 90 days after the appointment of the arbitrator. Unless the arbitrator finds that exceptional circumstances justify delay, the hearing will be completed, and an award rendered within 30 days of commencement of the hearing. The arbitrator shall have the authority to resolve such controversy or claim by finding that a party should be enjoined from certain actions or be compelled to undertake certain actions, and in such event said court may enter an order enjoining and/or compelling such actions as found by that arbitrator. The arbitrator shall make a determination regarding which party's legal position in any such controversy or claim is the more substantially correct (the "Prevailing Party") and the arbitrator shall require the other party to pay the legal and other professional fees and costs incurred by the Prevailing Party in connection with such arbitration proceeding and any necessary court action. Notwithstanding the foregoing, the parties expressly agree that a court of competent jurisdiction may enter a temporary restraining order or an order enjoining a breach of this Agreement pending a final award or further order by the arbitrator. Such remedy, however, shall be cumulative and nonexclusive, and shall be in addition to any other remedy to which the parties may be entitled.

(Exhibit 1, § 6(a))(emphasis added).

In October 2002, the Debtor, being unable to resolve his differences with the Partners, together with the Companies filed a "Joint Petition and Demand for Arbitration" (Exhibit 4) with JAMS/Endispute ("JAMS"), the private arbitration firm designated as the arbitrator in the SPA Arbitration Provision. The filing of

---

2. Betzold, Berg, Nussbaum & Heitman, Inc.   is defined in the SA as BBNH.

the joint petition commenced an arbitration proceeding referred to by JAMS as "JAMS Binding Arbitration Reference No. 1340004291" ("Arbitration"). (Exhibit 7). "Among other things, the Debtor and the Companies sought a declaration 'that the compensation he [Debtor] has received since the 1999 transaction does not violate that agreement.'" (JS, ¶ 5). Berg and Nussbaum were named as respondents. (JS, ¶ 5).

The Partners were unwilling to submit to the arbitration and on October 25, 2002 filed a five-count complaint ("Complaint") in the Circuit Court for the Eighteenth Judicial Circuit, DuPage County, Illinois ("DuPage County Court") against the Debtor, the Companies, Metanoia Publishing, Inc., and Bond Accounting Service, Inc., two affiliates of the Companies, case number 2002 CH 001591 ("DuPage Lawsuit"). (JS, ¶ 6). The Debtor and the Partners stipulate that the DuPage Lawsuit involves the same rights and issues as the Arbitration. (JS, ¶ 6).

On November 14, 2002, in response to the Complaint, the Debtor and the Companies filed a "Motion to Compel Arbitration." (JS, ¶ 6 and Exhibit 5). On April 11, 2003, the DuPage County Court entered an order compelling the parties to proceed with the Arbitration ("DuPage Court Order"). (JS, ¶ 7 and Exhibit 6). Specifically, the DuPage County Court compelled the arbitration of the Partners' claims against the Debtor and *vice versa*, including issues relating to the Employment Agreements. (Exhibit 6, ¶¶ 3 and 5). The DuPage County Court, however, did not reach the issue of arbitrability, leaving

that decision to the arbitrator. (Exhibit 6, ¶¶ 3 and 4).

With the exception of allowing written discovery to proceed, the DuPage County Court stayed the DuPage Lawsuit until after the arbitrator's final award and directed that upon issuance of the final award, "either party may seek to lift the stay for post arbitral proceedings."[3] (Exhibit 6, ¶ 9). Finally, the DuPage County Court certified its order as final under Illinois Supreme Court Rule 304(a), finding that there was "no just reason for delaying either enforcement or appeal or both of this Court's Order." (Exhibit 6, ¶ 10).

Both sides appealed the DuPage Court Order to the Second District Appellate Court of Illinois ("State Appellate Court"), but did not obtain a stay of the Arbitration Proceeding pending that appeal. (JS, ¶ 8). Accordingly, the arbitration went forward concurrently with the appeal.

In April 2003, JAMS notified the parties that Judge Thomas A. Hett, a retired Cook County Circuit Court Judge, would serve as the arbitrator ("Arbitrator"). (JS, ¶ 9). A "Second Amended Joint Petition and Demand for Arbitration before JAMS" was filed on May 30, 2003, adding Heitman as a respondent. (JS, ¶¶ 5 and 10 and Exhibit 7). In June 2003, the Partners filed the "Respondents' Statement of Answer and Counterclaim" in the Arbitration. (JS, ¶ 10 and Exhibit 8).

On June 27, 2003, the Arbitrator issued the "Arbitrator's Decision and Order on Issues of Arbitrability." (JS, ¶ 12 and Exhibit 9). In that decision, he found, *inter*

---

**3.** "Post-arbitral" proceedings may include, confirmation, modification or correction of the award, followed by a judgment entered in conformity therewith. *See generally,* Uniform Arbitration Act, 710 ILCS 5/1, *et seq.* The court may also vacate the award if, *e.g.*, "[t]he award was procured by corruption, fraud or

other undue means." *Id.,* § 12(a)(1). Whether the DuPage County Court hears the post-arbitral matters or a Circuit Court of Cook County, as suggested by the Partners' counsel, is up to those courts' interpretation of Illinois law.

*alia,* that the issues of the Debtor's compensation and the Debtor's alleged "Material Misrepresentation," which concerned the Debtor's failure to disclose the terms of the Bank Loan were arbitrable. (JS, ¶ 13 and Exhibit 9, pp. 3 and 5).

In July 2003, the Debtor and the Partners filed with the Arbitrator cross-motions for summary judgment. (JS, ¶¶ 14 and 15). On December 29, 2003, the Arbitrator issued his "Decision on the Motions for Summary Disposition Presented by the Petitioners and Respondents." (JS, ¶ 16 and Exhibit 11). In denying summary disposition on the issues concerning the Debtor's compensation, the Arbitrator concluded, *inter alia;*

> Both sides have made reasonable arguments concerning the definition of "compensation." It is my opinion that there is an ambiguity in this regard. *St. George Chicago, Inc., et al., v. George J. Murges & Associates, et al.,* 296 Ill. App.3d 285[, 230 Ill.Dec. 1013, 695 N.E.2d 503] (1st Dist. 5th Div.1998). As to this issue, the definition of "compensation," there is a genuine issue of material fact. Because of the consequences to both sides that resolution of this question poses, I believe it is best to allow the parties to present whatever permissible evidence is available on all of the compensation questions and issues presented in this Arbitration.

(Exhibit 11, p. 4). The Arbitrator also concluded that there were genuine issues of material facts precluding summary disposition as to the material misrepresentation claim. (Exhibit 11, pp. 6–7).

An evidentiary hearing was scheduled for March 23–26, 2004. (JS, ¶ 20). On March 8, 2004, prior to the commencement of the evidentiary hearing, the State Appellate Court ruled, affirming the DuPage County Court's decision to compel arbitration, but reversing the DuPage County Court to the "extent it left the issue of arbitrability to the arbitrator to decide." (JS, ¶ 19 and Exhibit 12, p. 8). The Court opined, with respect to arbitrability, that:

> Illinois courts have held that a claim is arbitrable if there is a "substantial degree of connection" between the contract and the particular claims being brought. *Bass,* 328 Ill.App.3d at 500[, 262 Ill.Dec. 471, 765 N.E.2d 1079]. *When the arbitration clause is broad, as in this case, it is immaterial that the dispute grew out of a contract that does not contain an arbitration clause, if the dispute also relates to a contract that does contain such a clause. See Drews Distributing, Inc. v. Silicon Gaming, Inc., 245 F.3d 347, 350 (4th Cir.2001). In our view, plaintiffs' [Partners'] claims against Betzold unquestionably have a substantial degree of connection to the Purchase Agreement [SPA].*

(Exhibit 12, p. 6)(emphasis added). The Court remanded that issue to the DuPage County Court for proceedings consistent with its opinion. (Exhibit 12, p. 8).

Upon conclusion of the evidentiary hearing, the Arbitrator issued an oral ruling, which was later transcribed, in favor of the Partners on the compensation issues and material misrepresentation claim. (JS, ¶ 20 and Exhibit 14). In his decision, the Arbitrator concluded that the term "compensation" in the Shareholders' Agreement was unambiguous and that the Debtor and the Companies had not proven ". . . that the definition of 'Compensation' in the SA, Section 2.3, includes the right of Betzold to include loan repayments, reserves and taxes, and those payments to himself breach the terms of the SA." (Exhibit 14, p. 4).

As noted earlier, in his summary judgment ruling, the Arbitrator found the word "compensation" to be ambiguous. After hearing the evidence, however, he conclud-

ed that the word was unambiguous. He explained that:

> In making my previous determination that the meaning of the word "compensation" was ambiguous, I did so on the basis that I had not heard the testimony of any of the parties or witnesses to the Shareholder's Agreement (SA) and the firm assertion by the Petitioners that such testimony would show the word "compensation" meant something more than the dictionary definition of money paid to compensate for services rendered, Black's Law Dictionary and Webster's Ninth New Collegiate Dictionary, "payment for services: esp., wages or remuneration." Webster's New World Dictionary, Third College Edition. A matter as serious to the parties as the resolution of the disputes presented in this arbitration mandated that both sides have as full an opportunity to prove their case as possible.

(Exhibit 14, p. 1).

The Arbitrator also decided that the Debtor "... has breached the representation warranty made in SPA Section 5(A)(iv)." (Exhibit 14, p. 5). This related to the Partners' Material Misrepresentation claim, i.e., the failure of the Debtor to disclose the terms of the Bank Loan to the Partners. The Debtor and the Companies filed a Motion to Reconsider, which the Arbitrator deferred until after the damage award was entered. (JS, ¶¶ 21 and 23).

In the papers filed in this Court, the Debtor alleges that the Arbitrator's difference of interpretation between the summary judgment ruling and the final ruling was so utterly inexplicable and legally unsupportable that something had to have caused it. The Debtor reports that he therefore undertook an investigation and discovered that the Arbitrator had a previously alleged undisclosed professional and personal relationship with Michael Ficaro, one of the Partners' trial counsel. The Debtor asserted a wide-range of allegations against the Arbitrator and Mr. Ficaro. The Debtor believes that this relationship caused a bias in favor of the Partners that improperly influenced the Arbitrator's reconsideration of the issue of compensation and ultimately resulted in findings in favor of the Partners.

On May 14, 2004, the Debtor and the Companies filed, in accordance with JAMS Comprehensive Arbitration Rules & Procedures ("JAMS Rules") (Exhibit 18), a motion to disqualify the Arbitrator. (See Exhibit 17). Rule 15(i) of the JAMS Rules, which govern the Arbitration, provides:

> At any time during the Arbitration process, a Party may challenge the continued service of an Arbitrator for cause. The challenge must be based upon information that was not available to the Parties at the time the Arbitrator was selected. A challenge for cause must be in writing and exchanged with opposing Parties who may respond within seven (7) days of service of the challenge. JAMS shall make the first determination on such challenge. Such determination shall take into account the materiality of the facts and any prejudice to the parties. That decision will be final.

The motion to disqualify was heard by JAMS' National Arbitration Committee and its Office of the General Counsel, in consultation with John Seitman, an arbitrator based in San Diego, California. (Exhibit 17). After reviewing the written submissions and considering arguments made by the parties at a telephonic hearing presided over by Mr. Seitman, JAMS denied the motion. (Exhibit 17). JAMS disagreed with the Debtor's arguments that the Arbitrator "failed to make appropriate disclosures concerning his prior contacts with Michael Ficaro [the Partners'

counsel]." (Exhibit 17, p. 2). The decision found no actual bias in the substance of the Arbitrator's rulings and noted that "[d]issatisfaction with the award or orders issued by an arbitrator does not support a claim of actual bias." (Exhibit 17, p. 2).

Finally, JAMS rejected the Partners' arguments that the Arbitrator should be disqualified:

> ... because of a complex set of circumstances relating to a corruption scandal in Cicero, Illinois while Judge Hett [the Arbitrator] was on the bench. There is no evidence Judge Hett was guilty of any wrongdoing in that matter; in fact, his prompt recusal from a case in which a stranger approached him under suspicious circumstances belies any suggestion that Judge Hett was susceptible to corruption. And Mr. Ficaro's [the Partners' counsel] representation of the wife of the supposed instigator of an attempted bribe (Mr. Ficaro having been retained by City of Cicero) is too tenuous a thread between Judge Hett and Mr. Ficaro.

(Exhibit 17, p. 2).

After denying the motion to disqualify, JAMS returned the matter to the Arbitrator for further proceedings. (Exhibit 17, p. 2). The Arbitrator then set the damages hearing for August 3, 2004. (JS, ¶ 24). The Debtor filed this chapter 11 case on August 2, 2004, thereby automatically staying the damages hearing and all further proceedings in the Arbitration. 11 U.S.C. § 362(a). The Partners filed this Motion to allow the Arbitration to be concluded.

### DISCUSSION

#### Modification of the Stay

Section 362(a) of the Bankruptcy Court provides, in pertinent part,

> (a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, ..., operates as a stay, applicable to all entities, of—
> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title.

11 U.S.C. § 362(a).

■■■ The purpose of the automatic stay is " 'to prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor.' " *In re Rexene Products Co.*, 141 B.R. 574, 576 (Bankr.D.Del.1992) (*quoting Borman v. Raymark Indus., Inc.*, 946 F.2d 1031, 1036 (3d Cir.1991)). The stay preserves what remains of the debtor's estate and "provide[s] a systematic equitable liquidation procedure for all creditors, secured as well as unsecured, ... thereby preventing a 'chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts.' " *In re Holtkamp*, 669 F.2d 505, 508 (7th Cir.1982) (*quoting In re Frigitemp Corp.*, 8 B.R. 284, 289 (S.D.N.Y. 1981)).

Modification of the stay is governed by § 362(d) of the Bankruptcy Code, which provides, in relevant part,

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such

as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest ...

■■■ There is no absolute definition of the term "cause" as used in this provision. The determination whether cause exists to lift the stay is a fact-intensive inquiry made on a case-by-case basis. *See In re Fernstrom Storage and Van Co.*, 938 F.2d 731, 735 (7th Cir.1991). The decision is committed to the bankruptcy court's discretion. *In re C & S Grain Co., Inc.*, 47 F.3d 233, 238 (7th Cir.1995); *Holtkamp*, 669 F.2d at 507; *In re Martha Washington Hosp.*, 157 B.R. 392, 394 (N.D.Ill.1993).

In this matter, the Partners argue that cause exists to modify the stay for at least two alternative reasons. First, the Partners contend that the *Rooker–Feldman* doctrine precludes this Court from ruling on the matters at issue in the Arbitration. Consequently, the stay should be lifted to allow the liquidation of the Partners' claims against the estate in a proper forum. The Partners alternatively argue that the balancing test factors set forth in the Seventh Circuit's *Fernstrom* decision weigh in favor of modifying the stay to allow the Arbitration to continue.

The Debtor argues that this Court should not allow the Arbitration to go forward given the bias of the Arbitrator. The Debtor argues in that regard that "the procedural irregularities and substantive errors that surround the Arbitrator's decision are so extensive, so fundamental, and the findings so one-sided, that no fair-minded person could have reached the result that the Arbitrator did." ("Debtor's Response to Partners' Motion for Relief from Stay," ¶ 27). Given what he thinks are irreparably flawed proceedings, the Debtor urges this Court, in his Motion to Enforce the Automatic Stay, to permanently stop the Arbitration and take up the trial of the issues addressed therein in the context of the Adversary Complaint.[4]

### Rooker–Feldman Doctrine

■■■ The *Rooker–Feldman* doctrine, which takes its name from two Supreme Court cases, prohibits an inferior federal court from reviewing state court decisions. *Crestview Village Apartments v. U.S. Dept. of Housing and Urban Development*, 383 F.3d 552, 555–56 (7th Cir.2004). "It is a jurisdictional doctrine premised upon the fact that, because federal district courts are courts of original jurisdiction, lower federal courts are not authorized to review appeals from state court judgments except, of course, where Congress has explicitly authorized such collateral review. Instead, 'only the Supreme Court has appellate jurisdiction over the civil judgments of state courts.'" *Id.* at 555–56 (citation omitted). In a recent opinion, the Seventh Circuit forcefully demonstrates the expansiveness of the doctrine:

Simply put, the *Rooker–Feldman* doctrine 'precludes lower federal court claims seeking review of state court judgments ... [because] no matter how erroneous or unconstitutional the state court judgment may be, the Supreme Court of the United States is the only

---

**4.** In the Adversary Complaint, the Debtor seeks: (i) a declaration that "(a) in setting his compensation, Mr. Betzold acted in accordance with the Agreements; and (b) any and all compensation Mr. Betzold has received from the Companies since 1999 is permissible" (Count I); (ii) the entry of a judgment against the Companies for breach of the Agreements (Count II); and (iii) the entry of a judgment against the Partners for breach of implied covenants of good faith and fair dealing in an amount not less than $5 million ..." (Count III).

federal court that could have jurisdiction to review a state court judgment.'

*Taylor v. Federal Nat. Mortg. Ass'n,* 374 F.3d 529, 532 (7th Cir.2004)(*quoting Brokaw v. Weaver,* 305 F.3d 660, 667 (7th Cir.2002)). If the *Rooker–Feldman* doctrine applies, the inferior court lacks subject matter jurisdiction over the proceeding.

■ To determine the doctrine's applicability, the court's fundamental inquiry is "whether the injury alleged by the federal plaintiff resulted from the state court judgment itself or is distinct from that judgment." *Crestview Village* at 555–56 (*quoting Garry v. Geils,* 82 F.3d 1362, 1365 (7th Cir.1996)). If the injury results from the judgment, the federal court lacks subject matter jurisdiction and redress for the injury lies with the state court appellate process. *Id.* On the other hand, if the injury presents an independent claim, than the doctrine does not apply and the court has jurisdiction to proceed to the merits. *See Id.* (*citing Kamilewicz v. Bank of Boston Corp.,* 92 F.3d 506, 510 (7th Cir.1996)).

■ *Rooker–Feldman* may also work to bar subject matter jurisdiction if the injury is "inextricably intertwined" with the state court decision. *Id.* A claim is "inextricably intertwined" with the judgment if it is related to the judgment under attack but not raised in the state court proceedings or if it is dependent on the state court judgment. *Zurich American Ins. Co. v. Superior Court for the State of California,* 326 F.3d 816, 823 (7th Cir. 2003). It is sometimes difficult to readily discern the entanglement of the federal claim with the state court judgment.

The Seventh Circuit explains that:

While "inextricably intertwined" is a somewhat metaphysical concept, the "crucial point is whether the 'district court is in essence being called upon to review the state-court decision.' " *Ritter v. Ross,* 992 F.2d 750, 754 (7th Cir.1993)(quoting *Feldman,* 460 U.S. at 483–84 n. 16, 103 S.Ct. 1303). The determination hinges on whether the federal claim alleges that the injury was caused by the state court judgment, or, alternatively, whether the federal claim alleges an independent prior injury that the state court failed to remedy. *See Long v. Shorebank Development Corp.,* 182 F.3d 548, 555 (7th Cir.1999).

*Taylor,* 374 F.3d at 533, *see also Epps v. Creditnet, Inc.,* 320 F.3d 756, 759 (7th Cir. 2003)("An action in federal court that alleges an injury 'inextricably intertwined' with a state court decision, such that success in the federal court would require overturning the state court decision, is barred by the *Rooker–Feldman* doctrine.").

■ In this matter, as noted earlier, the Debtor argues that the stay should not be lifted to allow the Arbitration to continue because those proceedings were irretrievably tainted. Moreover, the Debtor has requested, in his Motion to Enforce the Automatic Stay, to permanently stop the Arbitration and take up the trial of the issues addressed therein in the context of the Adversary Complaint. If this Court were to stop the Arbitration and revisit the issues directed to be arbitrated it would essentially be setting aside the state courts' decision to compel the Arbitration. Moreover, the Debtor is in essence asking this Court to interject itself into the state-court directed Arbitration and the state court appellate processes that follow an arbitration award. Such action would be a clear violation of the *Rooker–Feldman* doctrine. *See In re Robinson,* 265 B.R. 722, 728 (6th Cir.BAP2001), *aff'd* 326 F.3d 767 (6th Cir.2003)(bankruptcy court precluded under *Rooker–Feldman* from reviewing the state court order compelling

arbitration and "[a]ny portion of the Debtor's attack on the arbitration award that flows from the Debtor's contention that the initial arbitration process is flawed is therefore unfounded."); *Tyco Healthcare Retail Group, Inc. v. Kimberly–Clark Corp.,* 2003 WL 23204653, *4 (W.D.Wis. Jul.24, 2003)("Thus, because the state court determined that the parties must arbitrate their dispute concerning royalty payments, succession and combination and because plaintiffs alleged these issues in their amended complaint, the *Rooker–Feldman* doctrine bars this court from revisiting the state court's decision to compel arbitration as to these issues."); *Mailly v. Wachovia Corp.,* 2004 WL 601654, *3 (M.D.N.C. March 9, 2004)("As reflected by its order compelling arbitration, the state court already found a valid arbitration clause governing the disputes regarding Ms. Mailly's account. Therefore, Ms. Mailly is, in essence, seeking review of the state court's order to compel arbitration, and the *Rooker–Feldman* doctrine applies.").

Accordingly, this Court has no subject matter jurisdiction, by virtue of the *Rooker–Feldman* doctrine, to hear that portion of the Adversary Complaint dealing with the issues directed to be arbitrated by final orders of the state courts. Consequently, absent a modification of the stay, the liquidation of the Partners' claims against this estate would not take place. Therein lies the "cause" to modify the stay to allow the Arbitration to conclude. The conclusion of the Arbitration would of course encompass the post-arbitral remedies available to both the Debtor and the Partners. If the Arbitration was as defective and flawed as the Debtor alleges, he should avail himself of the state court processes to aid him. Modifying the stay does not deprive the Debtor of his rights under Illinois law. The SPA Arbitration Provision is clear and concise and governs, as the Debtor successfully argued before the state courts.

### Modification of the Stay Under the Fernstrom Factors

■ Assuming *arguendo* that application of *Rooker–Feldman* doctrine would not preclude this court from revisiting the issues presented to the Arbitrator, the Court would nonetheless find cause to modify the stay under the Seventh Circuit's *Fernstrom* opinion. *See Fernstrom,* 938 F.2d 731. In *Fernstrom,* the stay was lifted by the bankruptcy court to allow prosecution of a district court action brought by IBM for damages sustained when computer equipment stored in the debtor's warehouse was destroyed by fire. The lawsuit had been pending for six years, generating extensive discovery and numerous motions, when the debtor's counsel finally advised IBM and the district court that the debtor had filed bankruptcy over seven years earlier. *Id* at 732–33. The district court dismissed the suit with leave to reinstate in the event the bankruptcy court lifted the automatic stay. *Id.* at 733. The bankruptcy court lifted the stay, and the Seventh Circuit affirmed, applying the following three-pronged test for determining whether "cause" exists to lift the stay, *i.e.,* whether:

(a) Any great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit,

(b) the hardship to the [non-bankrupt party] by maintenance of the stay considerably outweighs the hardship of the debtor, and

(c) the creditor has a probability of prevailing on the merits.

*Id.,* at 735 (*quoting In re Pro Football Weekly,* 60 B.R. 824, 826 (N.D.Ill.1986)).

In applying this test, the Court in *Fernstrom* noted that the advanced stage of the litigation weighed heavily in favor of

stay modification, because otherwise, IBM would have been forced to, in effect, write off the expenses it had incurred in litigating its case to the eve of trial. *Id.* at 736–37. The Court explained:

> The attention paid to the stage to which the non-bankruptcy litigation has progressed is based on the sound principle that the further along the litigation, the more unfair it is to force the plaintiff suing the debtor-defendant "to duplicate all of its efforts in the bankruptcy court."

*Id.* at 737 (*quoting In re Murray Indus., Inc.*, 121 B.R. 635, 637 (Bankr.M.D.Fla. 1990)).

In this matter, there is little prejudice to the Debtor or the estate in completing the Arbitration. The Debtor does not dispute the Partners' contention that discovery is complete. The Arbitrator has already ruled on liability, leaving the motion for reconsideration and damages hearing. The Debtor can argue his motion to reconsider upon the entry of the award, and if unsuccessful on that motion, raise his arguments concerning the irrevocably tainted arbitration proceedings before the DuPage County Court, or such other state court which has jurisdiction, in accordance with applicable state law concerning confirmation of an arbitrator's award and post-arbitral remedies.

Second, the prejudice to the Partners in not lifting the stay far outweighs the hardship to the Debtor. The parties have spent over a year and a half before the Arbitrator, the DuPage County Court and State Appellate Court. Clearly, the Partners have expended considerable time and expense associated with that process. The Arbitrator's evidentiary hearing itself was a protracted, detailed proceeding. The Arbitrator noted in his decision on liability, that the hearing took place over several days, during which he considered "the ex-

cellent presentations," took copious notes of the testimony and evidence, including numerous deposition transcripts, and reviewed the parties' trial memos. (Exhibit 14). If the Arbitration were not allowed to go forward, the time and expense already expended by the Partners would have to be duplicated elsewhere.

Moreover, there is no persuasive reason for this Court to circumvent the process that the Debtor himself initiated and argued for on appeal to the State Appellate Court. Indeed, it was only after the Arbitrator found against him did the Debtor change his litigation strategy of insisting upon enforcement of the SPA Arbitration Provision. The Debtor appears to be violating the "mend the hold" doctrine, which precludes an about-face change in a legal position concerning a contract in the midst of litigation over that contract. *See Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 362–65 (7th Cir.1990). Here, to sanction the Debtor's mid-stream abandonment of his desire to be bound by the SPA Arbitration Provision and the arbitration proceedings that flow therefrom clearly prejudices the Partners.

The Partners have demonstrated a likelihood of success on the merits, in that the Arbitrator has issued a favorable decision. What remains is the fixing of damages, the motion to reconsider, and the post-arbitral proceedings.

Finally, and of some importance in the circumstances here, is the strong federal and state policies favoring arbitration. *See In re Griffin Trading Co.*, 250 B.R. 667, 673 (Bankr.N.D.Ill. 2000); *Burnett v. Safeco Ins. Co. of Illinois*, 227 Ill.App.3d 167, 179, 169 Ill.Dec. 113, 122, 590 N.E.2d 1032, 1041 (1992). That policy should be accorded weight in the balancing test.

Given the foregoing, all of the *Fernstrom* factors weigh in favor of modifying the automatic stay and cause is thus demonstrated.

### CONCLUSION

For the reasons stated herein, the Court will enter an order granting the Motion and modifying the automatic stay to allow the Arbitration to go forward to a conclusion and for post-arbitral proceedings in accordance with applicable Illinois law, provided, however, that the Partners, if successful, shall not seek payment of any monetary award except upon further order of this Court or without same if the Debtor's bankruptcy case is no longer pending.